IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

CHARLES GEORGE, by and through his limited curatrix, KAREN MEYER

 Plaintiff,             Case No. 24-2528

v.                    Jury Demanded

HOBBY LOBBY STORES, INC.

 Defendant.

## COMPLAINT

Plaintiff, by and through undersigned counsel, alleges as follows:

### JURISDICTION AND VENUE

1. This is a civil action to redress disability-based discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12182, *et seq*, and the Louisiana Human Rights Act, La. Rev. Stat. § 51:2247.

2. Plaintiff also asserts tort claims under state law.

3. This Court has jurisdiction under 42 U.S.C. § 12182; and 28 U.S.C. § 1367(a).

4. Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391(b) because the events or omissions giving rise to the Plaintiff's claims occurred there.

### PARTIES

16. Plaintiff Charles ("Chip") George is a 66-year-old man with intellectual disabilities.

17. Mr. George has been under a limited interdiction since 2019.

18. Mr. George's sister, Karen Meyer, is his limited curatrix.

19. Mr. George's other sister, Kimberly George, is his limited undercuratrix.

20. Defendant Hobby Lobby Stores, Inc. is a corporation organized under Oklahoma law. Its principal place of business is 7707 S.W. 44th St., Oklahoma City, OK 73179.

## FACTUAL ALLEGATIONS

19. Mr. George is a lifelong resident of Jefferson Parish.

20. As a six-month-old baby, Mr. George suffered an allergic reaction to a DPT vaccination, which temporarily stopped the flow of blood to his brain, resulting in permanent brain injury.

21. When he was eight years old, Mr. George's condition was exacerbated when he was hit by a moving vehicle.

22. Mr. George received special education in the Jefferson Parish School System, but did not make it past the eighth grade.

23. Mr. George reads at approximately a third-grade level.

24. Mr. George has speech impediments and facial tics that make it immediately obvious to a casual observer that he has an intellectual disability.

25. Anyone who knows or is familiar with Mr. George knows that he has an intellectual disability.

26. For most of his adult life, Mr. George worked as a manual laborer for the Jefferson Parish Streets Department, and he retired from this position in 2008.

27. As a result of his occupation, he has carpal tunnel syndrome in both hands, chronic lower back pain, and nerve damage in his leg.

28. While Mr. George lives alone in his (now deceased) parents' home, he is unable to care for himself without substantial assistance.

29. For instance, he cannot drive a car, keep a regular schedule, manage his own finances, manage his own health care (including picking up prescription medications or managing his medications), buy groceries for himself, clean his residence, or cook (including using an oven, stove, or a microwave).

30. Because he was unable to care for himself, Mr. George's sisters—Karen Meyer and Kimberly George—petitioned in 2019 for a full interdiction in the 24th Judicial District Court in Jefferson Parish, Louisiana.

31. The court appointed a curator ad-hoc and a medical examiner to examine Mr. George.

32. The medical examiner concluded that Mr. George "is unable to care for his person and property" and "would benefit from the appointment of a guardian."

33. The court then entered a judgment of limited interdiction, making Mrs. Meyer the curatrix and Ms. George the undercuratrix.

34. Though nominally a "limited" interdiction, the interdiction is extremely broad, divesting Mr. George of all "legal capacity to make any decisions concerning (1) any aspects of his property; and (2) the following aspects of his person: (a) healthcare, (b) medical treatment, (c) place of residence and (d) living arrangements."

35. The interdiction order also established a special-needs trust for Mr. George, funded by his family members, including his late parents.

36. Ms. Meyer provides Mr. George with a weekly allowance from his special-needs trust, but he usually spends all of the money on the first day.

37. His allowance started at $240 per week, but was reduced to $100 this past year because he would spend all of the money in one day.

38. Because of his advanced age and physical ailments, Mr. George uses a medical walking cane.

39. For the past 10 years, Mr. George has enjoyed shopping at the Hobby Lobby store in Harahan, Louisiana, located at 5151 Citrus Blvd.

40. Hobby Lobby does not own this property; it rents the building from a company called Elmwood Retail Properties, LLC, which owns the building and surrounding buildings.

41. At no point before the day in question had Mr. George ever been asked to leave the Hobby Lobby store.

42. During this time period, Mr. George spent roughly $100 per week shopping at Hobby Lobby, usually on Mondays, the day he receives his allowance.

43. All of the employees at Hobby Lobby knew Mr. George and were aware of his intellectual disability.

44. For 10 years, the employees at Hobby Lobby welcomed Mr. George and happily accommodated his disability.

45. For example, because he is unable to do basic math, Mr. George is unable to determine by himself whether he has enough money to purchase products.

46. As a result, Mr. George would get in line, hand certain items he wanted to the Hobby Lobby cashiers, and ask them to add up the total cost of the items, so that he could determine whether he could afford to purchase them.

47. However, one employee, named Heather Ford, harbored animus towards Mr. George and believed that his disabilities should not be accommodated.

48. In June 2023, Heather Ford was promoted to store manager.

49. Unlike the previous store manager, Heather Ford refused to accommodate Mr. George's disability.

50. He "has been a problem for years," and "the previous store manager never did anything about it."

51.     Ms. Ford complained that Mr. George's practice of asking cashiers to tally the cost of items for him was a "waste of the cashiers'" time.

52.     On November 27, 2023, Ms. Ford became angry because, after politely asking the cashiers to tally the cost of certain items, Mr. George said he would return later that day when he had the money to pay for it.

53.     Ms. Ford told Mr. George "you can't do that," because "my cashiers are wasting time on you."

54.     Ms. Ford then told Mr. George that "if you continue to do this I'm going to have to call the cops. I want you to stay out of this store and off of the property never to come back."

55.     When Mr. George asked "why" and stated "I did not do anything wrong," Ms. Ford called the police.

56.     Mr. George then walked outside the store.

57.     Mr. George remembered that he had left some of his personal items, including his keys, inside the store.

58.     Mr. George then tried to return to the store to retrieve his items, but Ms. Ford stopped him in the lobby and refused to let him enter the store.

59.     An argument ensued in the lobby.

60.     As Mr. George and Ms. Ford were arguing, a deputy from the Jefferson Parish Sheriff's Office arrived.

61.     The deputy was Deputy Aleia Pearson.

62.     Body-worn cameras and dashboard cameras captured the events that took place when law enforcement arrived.

63.     Deputy Pearson told Mr. George to walk outside, which he immediately did.

5

64. Ms. Ford then told the deputy that, unlike the previous store manager, she would not allow Mr. George to ask cashiers to tally the price of items for him.

65. Ms. Ford also said she wanted Mr. George charged with "trespassing," despite the fact that he been patronizing the store for 10 years without incident.

66. While Deputy Pearson and Ms. Ford were talking, Mr. George called his sister, Kimberly George (who lives nearby), to come pick him up.

67. Deputy Pearson then walked outside and tried to speak with Mr. George, who was standing on the sidewalk, while he was still on the phone with his sister.

68. Despite the fact that Mr. George had already vacated the store premises, Deputy Pearson told Mr. George that he needed to "get [his] things and then go."

69. Because of his intellectual disability, Mr. George did not understand Deputy Pearson's command and believed that he was under arrest.

70. Mr. George told Kimberly on the phone "Kim, I'm going to jail."

71. Mr. George then tried to hand the phone to Deputy Pearson and said, "Here, she wants to talk to you."

72. Deputy Pearson then said "I don't want to talk to Kim."

73. Deputy Pearson said that Mr. George could put the phone on "speakerphone," but Mr. George does not know how to do this.

74. Deputy Pearson continued harassing Mr. George, even though he had already left the store and was not bothering anyone.

75. Deputy Pearson then asked Mr. George where he lived and whether Kimberly was going to pick him up.

76. Mr. George responded, "yeah," that Kimberly was going to pick him up.

77. Even after being informed that Mr. George's sister was coming to get him, Deputy Pearson continued harassing Mr. George, asking him "Where Kim stay at?"

78. Mr. George said, "She's coming."

79. And Deputy Pearson asked "How long."

80. Mr. George responded, "I don't know."

81. Deputy Pearson then said "I have to know, because I'm not leaving until you leave," despite the fact that Mr. George had *already left the store and was standing on the sidewalk*.

82. Deputy Pearson continued harassing Mr. George for several more minutes, insisting that the sidewalk in front of the store was Hobby Lobby's "property," when in fact the sidewalk is owned by a completely separate entity called Elmwood Retail Properties, LLC, which rents its buildings, parking lots, and to various retailers.

83. Mr. George then said "Let me just go get my stuff" and began walking into the store again.

84. Despite previously telling Mr. George that he could "get his things" from inside the store before leaving, Deputy Pearson physically grabbed Mr. George by the jacket and forcefully pulled him back to prevent him from collecting his own personal items that he had left in the store.

85. Believing he was being attacked, Mr. George turned around with his fists in the air, saying "No! No!"

86. Mr. George was standing still, continuing to say "No! No!"

87. At this point, Kimberly George had arrived and was running over to the scene.

88. As she was running, Ms. George was yelling "Wait, wait!"

89. Rather than creating space between herself and Mr. George, or waiting for Ms. Kim, who was within earshot, Deputy Pearson advanced towards Mr. George, repeatedly saying "Alright, You're going to get pepper sprayed. You're going to get pepper sprayed."

90. Not understanding what is happening and believing that Deputy Pearson is trying to fight him, Mr. George advances towards Deputy Pearson to defend himself, causing Deputy Pearson to deploy her pepper spray at Mr. George.

91. In the exact moment she begins spraying pepper spray at Mr. George, his sister Kimberly stepped in front of Mr. George to restrain him, and Kimberly George was sprayed in the face with pepper spray.

92. About three seconds later, Ms. George's partner (a large man about six feet tall) physically restrains Mr. George and tells Deputy Pearson "hold on, we got him."

93. As both Ms. George and her partner are physically restraining Mr. George, Deputy Pearson *continues* to deploy her pepper spray at all three of them.

94. After Deputy Pearson finally stops gratuitously deploying her pepper spray, Ms. George asked "What happened"

95. Ms. George explained that he had been coming to the store for 10 years without incident and spends around $100 per week at the store.

96. After several more deputies arrived, Heather Ford came outside.

97. Ms. Ford complained that Mr. George would "loiter" in the lobby of the store (the area where the push carts are located), when she knew that Mr. George was actually waiting for his sister to pick him up.

98. Ms. Ford then repeated her complaint about Mr. George asking cashiers to tally prices for him.

99. Ms. Ford repeated her complaint that "The previous store manager didn't do anything" and that "This year when [she] got promoted and [she] became store manager" she decided that the store would no longer accommodate Mr. George's disability.

100. When Kimberly George explained that his brother receives an allowance, Ms. Ford responded "we can't do that, we're running a business."

101. Hobby Lobby, like all businesses, is subject to broad mandates of the Americans with Disabilities Act and cannot refuse to accommodate people with intellectual disabilities simply because a store manager believes doing so is inconvenient.

102. Kimberly pleaded with the officers to let her take her brother home, but they refused, informing her that Mr. George was going to jail.

103. After EMS treated Mr. George's eyes for the pepper spray, the deputies handcuffed Mr. George, placed him in a police cruiser, and took him to jail without his medications.

104. Despite the fact that Deputy Pearson never told Mr. George he was "under arrest," Mr. George was booked on a charge of resisting arrest.

105. Mr. George's other sister, Karen Meyer, posted bond for her brother the next day.

106. The Jefferson Parish District Attorney, Paul Connick, then filed a bill of information in the First Parish Court of Jefferson Parish alleging one count of resisting arrest.

107. Undersigned counsel was retained to defend the charge.

108. Undersigned counsel informed Mr. Connick that Mr. George was under an interdiction order and would not be deemed competent to stand trial and asked that he dismiss the case.

109. Mr. Connick, through one of his assistant district attorneys, communicated to undersigned counsel that he knew Mr. George would be deemed incompetent but that the prosecution would nonetheless proceed.

110. Thus, despite knowing that Mr. George would inevitably be deemed incompetent to stand trial, Mr. Connick insisted on wasting taxpayer money to continue prosecuting Mr. George.

111.   The judge in First Parish Court appointed a competency commission, comprised of two forensic psychiatrists: Dr. Richard Richoux, M.D., and Sarah DeLand, M.D.

112.   As predicted, the physicians concluded that Mr. George was not only incompetent to stand trial, but was "*irrestorably* incompetent" and that no amount of competency-restoration services could ever make him competent to stand trial.

113.   In particular, the Dr. Richoux and Dr. DeLand concluded that:

> He spoke with an obvious impediment; but this was mild enough such that he was fully intelligible. His level of intellectual functioning was estimated to be low enough to justify a diagnosis of Intellectual Disability in the absence of his history of brain injury … Not surprisingly, Mr. George demonstrated significant deficits in his factual knowledge and understanding of legal proceedings as defined by the Bennett criteria. He mistakenly believed that his pending charge involved an allegation of criminal behavior toward a civilian rather than toward the police. He was completely unfamiliar with pleas, verdicts, and legal consequences. His description of the judge's role was "You raise your hand, and you tell him the truth." Mr. George spontaneously stated that "Chris is a good lawyer "and when asked to explain, he replied "He fights for himself." We believe that Mr. George is unable to rationally assist counsel. He would have difficulty testifying relevantly, identifying and communicating inaccuracies in witness testimony, and making rational decisions in response to the advice of counsel.

114.   In light of the physicians' report, the First Parish Court judge dismissed the charge with prejudice.

115.   Mr. Connick did not appeal.

116.   After the criminal case was dismissed, Mr. George obtained a copy of the surveillance footage, which corroborates most of the allegations herein.

117.   Mr. George would return to Hobby Lobby if he were allowed to, but Hobby Lobby has banned him from the store and property.

## FIRST CLAIM – Disability Discrimination (ADA)

95.   Plaintiff repeats and realleges all allegations of this Complaint as set forth above.

10

96. Defendant violated Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182, because it is a public accommodation that discriminated against Plaintiff on the basis of his disability.

97. Defendant failed to accommodate Plaintiff's disability and/or treated Plaintiff less favorably because of his disability.

98. Plaintiff suffered injuries as a result of the Defendant's acts or omissions.

### SECOND CLAIM – Disability Discrimination (La. Rev. Stat. § 51:2247)

102. Plaintiff repeats and realleges all allegations of this Complaint as set forth above.

103. Defendant violated La. Rev. Stat. § 51:2247 because it "den[ied] an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation, … on the grounds of … disability."

104. Defendant failed to accommodate Plaintiff's disability and/or treated Plaintiff less favorably because of his disability.

105. Plaintiff suffered injuries as a result of Defendant's acts or omissions.

### THIRD CLAIM (Negligence)

106. Plaintiff repeats and realleges all allegations as set forth above.

107. The Defendant had a duty to Plaintiff to conform its conduct to a specific standard of care, and its conduct fell below that standard of care.

108. The standard of care is set by federal and state law.

109. The Defendant's negligence caused Plaintiff damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment:

11

1. Declaring that Defendant's conduct as set forth above violates 42 U.S.C. § 12182, and La. Rev. Stat. § 51:2247.

2. Declaring that Defendant is liable for negligence;

3. Awarding compensatory damages, expectation damages, punitive damages, nominal damages, and any other form of damages available to Plaintiff for injuries caused by Defendant's discriminatory and tortious conduct.

4. Awarding costs and attorney's fees to Plaintiff, pursuant to 42 U.S.C. § 12188, La. Rev. Stat. § 51:2264, and any other applicable provisions;

5. Granting such further relief as this Court may deem just and proper.

## JURY DEMAND

Consistent with Federal Rule of Civil Procedure 38(b), Plaintiff hereby requests a trial by jury as to every claim for which he is entitled.

Respectfully submitted,

October 23, 2024

   /s/ *Chris Edmunds*
Chris Edmunds, Counsel for Plaintiff
LBSA: 37670
Chris Edmunds Law Office
740 Dante St.
New Orleans LA 70118
(504) 314-0034
chrisedmundslaw@gmail.com